Bland, Chancellor.
The motion to dissolve the injunction standing ready for hearing, the solicitors of the parties were heard and the proceedings read and considered.
It has been urged, in support of this motion, that this was not merely and properly a case of waste, but an injunction, in restraint of trespass, granted at the instance of a plaintiff who claimed title; which title had been directly and positively denied by the defendants. And that according to the well established law of this court, as deduced from the English authorities, no such injunction could be granted or continued where the title of the plaintiff, as in this instance, was admitted to be in dispute, or was altogether denied by the defendant in his answer. This objection is certainly well founded upon the principles of the English law; but it is otherwise according to the law of Maryland.
*571 This is the first instance, since I have been here, in which the correctness of this peculiar species of injunction has been called in question; and as its origin and nature seem to have fallen into some degree of obscurity; it may be well to take a larger view of the subject than might otherwise be deemed necessary.
The terms waste and trespass are very often used to designate injuries to property of the identical same nature. The cutting of a timber treé, or the pulling down of a house, may be an act entirely lawful; or it may be an act of waste, or of trespass ; and, that not because of any peculiarity in the act itself; but, because of the party, by whom it may have been done, having an absolute title, a limited estate, or no right whatever. The absolute owner of an estate in fee simple, without any incumbrance, or charge upon it, has an uncontrollable power to dispose of it as he may think proper; and can be, in no way, held accountable, as a waster or trespasser, for any thing he may do with the trees, houses, or soil of his lands. If he who does such an act has only a particular estate, as a tenancy for life or years, it is properly denominated waste; but, if he has no right whatever, it is then said to be a trespass. In general, when any permanent or lasting injury is done, by the holder of the particular estate, to the inheritance, or to the prejudice of any one who has an interest in the inheritance, it is properly called waste; as where timber trees are felled, or houses are destroyed by a tenant for life or years; or by a mortgagor or mortgagee in possession; or by a tenant in fee simple, where the State has reserved to itself an interest in the trees, &c. for the use of the public, (a)
*572 • In general waste is the abuse, or destructive use of property by him w'ho has not an absolute unqualified title. And in general trespass is an injury, or use, without authority, of the property of another, by one who has no right whatever.
At common law, if the owner of the inheritance had good reason to believe, that a tenant in dower, or by the courtesy, or a guardian designed to commit waste, he might, before any waste was done, have a prohibition directed to the sheriff, commanding him to prevent it from being done; and in execution of this writ of prohibition, the sheriff might, if necessary, call to his aid the posse comitatus. This writ was extended, by a statute passed in the year 1267, to tenants for life and for years: and afterwards, in 1285, it was taken away, and another form of writ given in its place ; but when the court of chancery first granted injunctions, it seems to have taken its jurisdiction from this writ of prohibition of waste. (b)
After waste had been actually committed, the ancient corrective remedy, in a court of common law, was by a writ of waste, for the recovery of the place wasted and treble damages, as a compensation for the injury done to the inheritance, (c) There were, however, several cases to which the writ of waste did not extend; and as to such cases, the party was left without any remedy at common law. The action of waste could only have been brought by him who had the immediate reversion or remainder, to the disinheritance of whom the waste was always alleged to have been committed ; and therefore, if a lease had been made to A for life or years, remainder to B for life; and A committed waste, the action could not be brought by him, in reversion or remainder, so long as *573 the life estate of B continued. But the intervening life estate only suspended the remedy ; for, after its termination, the reversioner, or remainderman might then bring his action against A for the -waste done before that time.(d) Nor could any one maintain this action unless he had the estate of inheritance in him at the time the waste was committed; nor could it be sustained against an executor, for waste committed by his testator, it being a wrong which died with the person; nor could one coparcener bring an action of waste against another; although one joint tenant or tenant in common might have a writ of waste against his cotenant, compelling him either to make partition, and take the place wasted as his own share, or to give security not to commit any further waste, (e)
At the common law there was no process by which a threatened trespass upon a real estate, however great or irreparable, could be prevented. After the act was done the injured, owner might bring his action of trespass against the wrongdoer, and recover satisfaction in damages ; but, the common law gave him no means of preventing the execution of the designs and threats of any one, whose declared and settled purpose was to commit a trespass upon his lands. If however the claimant was not in possession, and he thought proper to bring an action to establish his right, and recover the estate ; then, and in aid of such suit, and to prevent any injury from being done to the property, pending the controversy, the common law gave the writ of estrepement. (f) It would seem, that originally this writ could only be used as an aid to a real action for the recovery of the land itself; but, its scope having been extended by statute, it was afterwards used in connexion with actions in which no land was demanded, as in actions of waste, trespass, &c. It was not, however, allowed to be associated with a suit for partition; because the tenants, being both of them in possession, there was no reason why one should be restrained and not the other. A writ of estrepement might.be sued out at the same time, and together with the original writ, commencing the action; and that too, in those cases where damages for waste done, pending the action, might be recovered; because it was injurious to the commonwealth that waste should be done, and peradventure he who committed it might not be able to satisfy the plaintiff his full damages, (g)
*574 The writ of estrepement is certainly a preventive remedy, and so far it is analogous to a writ of prohibition, by which a tenant in dower, or by the courtesy might be prevented from doing waste. But it is more; it is also a remedial and corrective remedy; because, the holder of land may not only be prevented from doing waste; but if he should do any notwithstanding the prohibition, the plaintiff may recover damages for such waste, even up to the time when possession shall be delivered to him. This writ has some other peculiar traits of character. It can never be brought into action independently and alone; it must always be associated with another as its leader; to which it acts as an auxiliary, whose fortunes it must follow, and to whose final fate it must submit. If it emanates, as it may, at the same time and together with its chief, from the chancery office, it is then called an original; but if it be awarded by the court, in which the action is depending, as it may, it is then called a judicial writ of estrepement. This writ, as its very name distinctly imports, is always intended to stay waste. It is no where spoken of as a means by which a mere trespass may be prevented; in all its modifications, it is continually treated as a remedy against waste.(h) But in a writ of right, and in all the other actions, except a writ of waste, to which an estrepement is called in .as an auxiliary, there is not any privity of title whatever between the parties to the suit; all such privity being expressly disavowed. The plaintiff asserts, and calls for the vindication of his absolute title against an unqualified wrongdoer, who he complains of as a disseizor, ejector, or trespasser. And, therefore, in all such' cases, the injury which it is the office of the writ of estrepement to prevent, is not properly toaste, founded on privity of title, as between a reversioner and a particular tenant; but literally a trespass, in the chancery acceptation of that term; and not a mere abusive use of that which a lawful holder had a right to enjoy.
Where the title and 'the rights of the parties are admitted, there can be no mistake; and therefore, there should be no confusion or misapplication of these terms waste and trespass. But, in the English authorities, there is not the same distinctness, in the application of them, to any such injuries to the inheritance, where the rights of the parties are disputed and put in litigation. If the party asserts his title to an estate, by an action at law, such acts, with *575 reference to a presumption in favour of the validity of his title pending the suit, are said to be waste; but if he asks, in a court of chancery, to have the doing of such acts prevented by an injunction, they are denominated trespasses, (i) This difference in characterizing the same injurious acts, when proposed to be prohibited by an estrepement, as waste ; and when proposed to be restrained by injunction as trespass, has been attended with some confusion. And therefore in relation to the peculiar species of injunctions, now under consideration, all such acts as would be deemed waste, when done by an admitted particular tenant, if done after the institution of any suit involving the title, or of a suit for partition, it may be well to denominate eventual waste.
The judicial records of the State, and the acts of Assembly regulating officers’ fees shew, that the writ of waste as well as the writ of estrepement were at one time in common use in Maryland.(j) But here, as in England, these writs have fallen into disuse, and are now seldom, or never brought, having given way to the more easy and expeditious remedy by an action upon the case in nature of waste at common law; by which the plaintiff obtains satisfaction for the injury done to his inheritance by a recovery of damages alone ;(k) and in Maryland to an injunction from chancery which performs the office of a writ of estrepement.
The whole subject of waste, in Maryland, seems to have passed, almost altogether, from the cognizance of the courts of common law to that of the court of chancery; and the shifting of this matter so entirely, from the one jurisdiction to the other, may be attributed to the nature of the injury requiring redress; to the different constitutions' of the tribunals; and to their peculiar modes of proceeding. Waste is a wrong which cannot always be. duly estimated and remunerated in damages ; it is an injury which requires to be met, in its onset, or earliest approaches, by a strong and decisive preventive remedy, acting with a promptness almost amounting to surprise; and yet affording to the party restrained a speedy hearing. No adequate remedy of this kind, it is evident, can be obtained from a court of common law, open only at short intervals during the year; acting from term to term; and *576 limited to a given set of technical forms of proceeding. Hence it is, that the remedy has been so constantly, in modem times, sought in the court of chancery, which is always open, constantly accessible, and is capable of moving with an energy and despatch called for by the emergency, and suited to the peculiar nature of the case.
In general an injunction may be obtained, in this State as in England, to stay waste in all cases where an action of waste would lie at common law, whether there be any privity of title or not ;(l) and in a variety of others in which no such action could be brought, even where there was a subsisting privity of title or contract between the parties. A mere threat to commit waste is a sufficient foundation for an injunction before any waste has been actually done, (m) And an injunction maybe granted where no account of damages could be claimed; or where the waste done is so insignificant that there could be no recovery of damages at law.(n) It may he granted in favour of a child en venire sa mere ;(o) in favour of trustees to preserve a contingent remainder, before the contingent remainderman has come in esse ;(p) in favour of any one entitled to a contingent or executory estate of inheritance ,(q) and in favour of a remainderman or reversioner, where there is an intervening estate for life.(r) An injunction may be obtained, in respect of equitable waste, against a tenant in tail after possibility of issue extinct ;(s) against a tenant for life without impeachment of waste ;(t) and against a mortgagor or mortgagee in possession.(u) An injunction may be granted as between tenants in common, joint tenants, and coparceners, against malicious destruction, or when the tenant committing the waste is insolvent, or is occupying tenant to the plaintiff, (v) And so too, where some of the heirs had filed their bill in this court against the rest to obtain a partition according to the act to direct descents, and one of the heirs, who was in possession, was committing waste; upon a *577 representation of the fac-t, by the trustee appointed to make sale of the lands for the purpose of effecting a partition, he was restrained by injunction.(w) When the bill is for an injunction to stay further waste, and waste has been already committed, the court, to prevent a double suit, will decree .an account and satisfaction for what is past, and not oblige the plaintiff to bring an action at law as well as a bill in equity; but such decree for the past is only given as an incident to the injunction, to obtain which the plaintiff was under a necessity of coming into chancery : and, consequently, it may be regarded as a general rule, to which there are few exceptions, that when no- injunction is, or can be asked for or granted, a bill to have an account of past waste, and nothing more, cannot be sustained, the proper remedy being at law. (x)
It appears, that the English Court of Chancery had steadily confined itself in granting relief against waste, to those cases only where there was some subsisting privity of title or contract between the parties, until about the year 1785; since which time it has gone one step further, and granted injunctions against strangers to stay trespass, in strong cases of destruction or irreparable mischief ; or where the irreparable mischief might be completely effected before any trial could be had as to the controverted right. But, at that point, it seems to have come to a stand; not, however, without expressing a regret, that its jurisdiction had not been extended so far as to protect real estate from waste and injury pending a controversy about the title. I have seen no reason to doubt, that the powers of this court in granting injunctions have been always considered as in all respects coextensive with those of the chancery court of England.(y)
It appears to be even yet the fixed rule of the Court of Chancery of England, that the granting of an injunction to stay waste must depend, either upon the fact of there being a privity of title or contract acknowledged by the answer; or an unquestionable legal or equitable title in the plaintiff; as where a purchaser files a bill for specific performance of his contract, suggesting, that the defendant was proceeding to cut timber &c., an injunction may be *578 granted if the contract be stated and admitted. For if the hill states and admits, that the defendant asserts and relies upon what he alleges to be a valid adverse title in himself, the plaintiff thereby states himself out of court, or if the defendant in his answer positively denies the plaintiff’s title, the injunction will be refused; or having been granted will, on the coming in of such an answer, be dissolved, (z)
It is said, however, in one of the most respectable treatises on pleadings in chancery, that, “pending an ejectment in a court of common law, a court of equity will restrain the tenant in possession from committing waste, by felling timber, ploughing ancient meadow, or otherwise. Against this inconvenience a remedy at the common law was in many cases provided during the pendency of a real action, by the writ of estrepement; and when the proceeding by ejectment became the usual mode of trying a title to land, as the writ of estrepement did not apply to the case, the courts of equity, proceeding on the same principles, supplied the defect.”(a) But the only authorities cited in support of what is here said are cases between landlord and tenant, where the title of the plaintiff had ncit been, and could not be denied by the defendant who confessedly held only as tenant, (b) Whence it is evident, that there can be no means of preventing waste from being done upon real estate, in England, pending a suit to determine the title, other than the writ of estrepement; and that writ, it is said, has fallen into disuse, (c)
But in a variety of other cases the English Court of Chancery is in the habit of exercising its preventive and conservative powers for the express purpose of preserving the subject of litigation from waste, injury, or total loss, pending the controversy.
' In cases of patent rights, where the plaintiff is in possession of the invention, under colour of title, an injunction may be granted pending the proceedings at law to try the right, (d) And so, too, where the plaintiff claims the copy-right of a book, an injunction may be granted to prevent publication, during the continuance of a suit at law. In cases of copy-right the jurisdiction is assumed merely for the purpose of making the legal right effectual,’which *579 cannot be done by any action for damages, because, if the work is pirated, it is impossible to lay before a jury the whole evidence as to all the publications, which go out to the world, to the plaintiff’s prejudice; and therefore, with a view to -make the legal right effectual, the publication will be altogether prohibited. Where a fair doubt appears, as to the plaintiff’s legal right,-the court always directs it to be tried; making some provision in the interim, the best that can be, for the benefit of both parties, (e) And on a proper case being presented the court will grant an injunction, and appoint a receiver to preserve personal property while a suit is depending in the ecclesiastical court, although an administration pendente lite might be there obtained, (f) In general, where personal property, or the rents and profits of real estate in dispute, are in imminent danger of being wasted or lost, a receiver may be appointed to take care of it, for the benefit of all concerned, pending the controversy, (g) To accelerate the progress of the suit, as well as for the greater security of the fund, for the benefit of those who may ultimately appear to be entitled to it, money may be ordered to be brought into court where the defendant admits, that he has it in his hands, and that he has no title to it. (h) And there are many instances where the .court interposes by injunction to secure the enjoyment of specific chattels; either because of their peculiar character; or because, from the nature of the property, it would be difficult or impossible for the plaintiff to have the full benefit of it, unless he could specifically enjoy it.(i)
Looking to the general reasoning and principles of those various cases in which the English Court of Chancery interposes for the preservation of property, the right to which is in litigation, it does indeed seem strange, that it has so pertinaciously refused an injunction to prevent irreparable mischief, and.to put a stop to the further commission of waste upon real estate during the continuance of an action at law to try the right. It is admitted, that there is no good reason why the court should not interfere in such cases. Should it turn out, that the defendant had an unquestionable title, then the granting of such an injunction could only operate temporarily and partially to the prejudice of the free exer *580 cise of his right of property. But on the other hand, if it should be eventually shewn, that the plaintiff had the title, then, as the injunction turns no one out of possession, nor displaces any thing, it must necessarily leave to the defendant the advantage of fighting the plaintiff with his own property. Upon which, had not the injunction been granted, the most irretrievable destruction might have been perpetrated; acts of waste might have been committed which would deprive the plaintiff of the very substance of his inheritance; mischief might have been done which it Would require years to repair ; and things might have been torn away or destroyed which it would be difficult or impossible to restore in kind; such as the buildings, fixtures, trees, or other peculiarities about the estate, which a multitude of associated recollections had rendered precious to their owner; but, as a compensation for the loss of which a jury would not give one cent beyond their mere value. A man has a right to secure to himself a property even in his amusements ; and, it is not fit in any such cases to cast it to the estimation of people, who may have not the least sympathy with the feelings of the owner, to set a value upon his privileges or his property.(j)
The High Court of Chancery of Maryland has from the beginning, or certainly for a great length of time past, in this respect, acted more in harmony with its general principles, than the Court of Chancery of England, by interposing to prevent waste and destruction in all cases, during the continuance of a suit in which the title to the property has been, or may be brought in question ; as well where the subject of litigation was real estate, as where it was mere perishable personalty, or money, or choses in action in the hands of the defendant. A similar and equally extensive application of the writ of injunction to stay waste, appears to have been made by the courts of chancery of Virginia and South Carolina.(k) As I have before observed, there is sufficient evidence of the writ of estrepement having been at one time often resorted to in this State; although it has now fallen into total disuse. But even that writ must have been a very tardy and inadequate remedy *581 compared with an injunction; which is the' only judicial proceeding, that seems to be, in all respects, capable, by its promptness and vigor, of preventing irreparable mischief from being done to real estate pending- the litigation, by a provoked and desperate defendant.
When this mode of interposing by injunction to stay waste, pending an action at law or a bill in chancery, was first allowed by this court, I have not been able distinctly to ascertain; but it is evident, that it had been considered as a settled course of proceeding under the Provincial Government; for upon an information in chancery, filed on the 13th of April 1775, by the attorney general, at the relation of Josias Bowen, against Nicholas Norwood, to vacate a patent grant for a tract of l,and, it was alleged, that the defendant in possession was committing great waste ; to stay which an injunction, was asked and immediately granted until the final hearing.(l) I have seen a case of this kind, in which, in the year *582 1783, this form of a writ of injunction to stay waste pending an action of ejectment, appears to have been treated as then well established ;(m) and I have met with another instance in which an *583 injunction was granted in the year 1803, apparently without hesitation, to stay waste until the final judgment in an action of ejectment. In which case, on its being urged that the defendant ought not to be thus deprived of the free use of his property, the court said, that he had no other mode of relieving himself from the restriction than by pressing the action at law to a conclusion as speedily as possible.(n) I have met with many other similar cases; but in no one of them does it appear that any objection had been made, grounded upon the principles of the English authorities, against the propriety of granting or continuing the injunction, because the plaintiff had stated, that his title was disputed, or because the defendant had positively denied its validity. And *584 so too in cases of nuisance, although it is necessary in England, that the individuals complaining of the injury should have had their rights first established at law,(o) yet here, where an action or the proper proceeding has been instituted to try the right, an injunction may be granted to prevent the repetition or further continuance of the nuisance until the right has been thus determined at law or in the regular mode.(p)
The writ of injunction in cases of this kind, to stay waste pending a suit to try the right, has, in Maryland, taken the place and performs the office, in all respects, of the ancient writ of estrepement. It is an injunction not founded on any privity of title or contract whatever; it is an attendant upon and an auxiliary of the action at common law, or the suit in this court in which the title has been or may be drawn in question ; it follows and shares the *585 fate of that suit, and cannot be dissolved upon an answer, in anyway, denying the plaintiff’s title, until that suit has been fully determined in favour of the defendant. Like an estrepement, its restrictions do not extend to an inhibition of any ordinary use of the land by the occupying tenant; for he is allowed to cultivate it as usual, and to take wood for fuel, repairing of houses, for fencing and the like, so he does no waste or destruction to the inheritance.
It must, however, be recollected, that there is no instance of this court’s ever having interposed by an injunction to prevent a mere trespass, not instant and irreparable where no suit had been instituted, here or in a court of common law, involving the title ; for, against the granting of such an injunction, which does not operate as an auxiliary to a suit to try the right, the same reásons apply here as in England. It does not fall within the jurisdiction of a court of equity to try the validity of mere legal titles ; for all such purposes recourse must be had to the ordinary tribunals of the common law. A person can only come here to obtain the interposition of the conservative powers of this court in cases where the common law remedies are inadequate or to which they do not at all apply. If the plaintiff’s title is denied, and he acquiesces in the denial by refusing to bring an action at law to have it authenticated and sustained, he can have no ground to ask any relief of this court, founded on a claim which he himself thus shrinks from having judicially investigated, or put into a course of being legally established.
In conclusion I deem it proper to remark, that this mode of applying for this injunction by a separate bill, was irregular and improper; it should have been asked for by a petition, filed in this case, without praying for a subpcena to bring in defendants who were already before the court. The urgency of the case may be some excuse for the irregularity ; but I shall in all cases as far as practicable require parties to pursue the regular and proper course.(q) In this instance, however, the injunction seems to have been extended rather beyond the bounds of the case presented by the bill itself; as to so much therefore it will be dissolved, or rather circumscribed within its proper limits. .
*586 Whereupon it is ordered, that the injunction heretofore granted in this case, in so far as it prohibits the removal of any timber or wood which had been cut and severed from the land prior to the service thereof; and also from cutting and taking away timber or wood necessary for the repairs of buildings or fences, and for the use or proper cultivation of the land, be and the same is hereby dissolved; and that in all other respects the same be and is hereby continued until the final hearing or further order.
After this the original and principal case was brought before the court.
19th May, 1829. — Bland, Chancellor. — This case standing ready for hearing, and having been submitted on the notes of the defendants’ solicitor, and no one appearing on behalf of the plaintiff before the end of the sittings of the term according to the rules of the court, the proceedings were read and considered.
Samuel Peach, having obtained a judgment at law, in Prince George’s county court, against this defendant Nathan Waters, sued out a fieri facias, which was levied on certain parcels of land as his property; whereupon the sheriff, at April term 1827 of that court, made a return in the following words : “ Made by sale to Doctor Charles Duvall on the thirtieth day of December eighteen hundred and twenty-six, of all the interest of the defendant in and to the following parcels of land; to wit, one tract of land called Pastures Enlarged, containing two hundred acres more or less; one tract of land called Osbourne’s lot and part of Pleasant Grove, containing fifty-two acres more or less; one tract of land called Duvall’s Pleasure, or part of Duvall’s Pleasure, containing one hundred and fifty acres more or less; one tract of land called Teukesbury, and a part of Teukesbury and Walker’s Delight, containing one hundred and fifty acres more or less; and a tract of land called Friendship, containing one. hundred and eighty acres, the sum of thirteen hundred and fifty dollars, which has been paid to me by the said Charles Duvall, and by me paid to the plaintiff’s attorney.”
This return constitutes the commencement of the title of the plaintiff upon which he rests his pretensions. He alleges, that the defendant Nathan Waters, by a deed bearing date on the 17th of February 1824, conveyed the lands mentioned in this return to Nathan I. Waters, and Samuel Ratcliff; that Ratcliff had conveyed *587 a part of the same lands to Nathan I. Waters, by a deed bearing date on the 29th of August 1825; and that these deeds were made without valuable consideration, and are fraudulent and void. Whereupon he prayed, that they might be set" aside and annulled as against him.
The defendants by their answer alleged, that the deeds were made bona fide, for a valuable consideration, and they objected, that the return of the sheriff was so defective, that it could give to the plaintiff no title whatever.
If these deeds are really valid, as the defendants contend, there is an end of the matter, since it cannot be necessary to inquire into the correctness of the return for any other purpose than to ascertain how far it is available as passing the property of Nathan Waters ; which alone was liable to be seized and sold- under the fieri facias.
The first question then is, whether those deeds were bona fide and valid transactions or not? The deed of the 17th of February 1824, which is the principal one, carries upon its face, that which is calculated to awaken suspicion. It deals in comprehensive generalities. Such and such tracts or parcels of land by name, without any particular specification of locations or boundaries; and, all the furniture and plantation utensils, without any schedule of them, are conveyed to the grantees. There is certainly nothing absolutely illegal in this mode of conveying property; but real sellers and purchasers do not commonly deal so loosely. There is usually some other security required, than the purchaser’s own bond merely for so large an amount of purchase money as nine thousand one hundred and fifty dollars in return for an absolute deed of this kind; and the purchaser too, in most cases, is not content with any thing short of a precise and unequivocal description of the property he has bought and intends honestly to pay for. At the time this deed, of the 17th of February 1824, was made, the defendant Nathan Waters, who lived upon this land, had one son and five or six daughters, all of whom were more or less dependent upon him. He was in embarrassed circumstances. His younger daughters lived with him; and his son also, was an inmate of his house, and occasionally worked with him at his trade of a millwright; but it is somewhat doubtful whether his son was then of full age or not; the witnesses differ about the fact. Samuel Ratclijf, William Beck, and Philemon Jones, with their wives, who were his daughters, also lived upon this land, and derived their *588 subsistence from it. After the date of the conveyance of the 17th of February 1824 to Nathan I. Waters, the son, and Samuel Ratcliff the son-in-law, Nathan Waters continued to hold possession of the land, claiming it as his own, and exercising many unequivocal acts of ownership over it; he sold timber off it, he rented parcels of it, and gave receipts for the rent as due to himself; and he once drove from it his son; who, as well as Ratcliff, admitted, after the date of the deed, that they had no right to it. There is no clear unsuspicious proof, that either Nathan I. Waters or Samuel Ratcliff ever paid to Nathan Waters any thing whatever for this land. The one, as his son, and the other, as the husband of one of his daughters, no doubt had his confidence and shared his best affections; and the more so as they were both poor and had no way of accumulating large sums of money.
In short, it is clear, from all the circumstances of this case, that this deed, of the 17th of February 1824, was in truth, made, as Nathan Waters himself declared to one of the witnesses, merely “ for the purpose of protecting his property until he could pay his debts,” and, that it was a conveyance contrived with the express intent to defraud his creditors; or as it is declared in the strong language of the venerable statute of 1570, “ not only to the let or hindrance of the due course and execution of law and justice, but also to the overthrow of all true and plain dealing, bargaining and chevisance between man and man.”(r) I shall therefore pronounce both these deeds, for the second must follow the fate of the first, to be utterly void as against this plaintiff if his claim under the return be a sound one.
The next inquiry, therefore, is, as to the validity of the plaintiff’s claim. The property in question was sold by the sheriff under and by virtue of a writ of fieri facias issued on a judgment obtained in an action at common law by Samuel Peach against this defendant Nathan Waters ; and this plaintiff makes title as the purchaser at that sale. But these defendants object, that the description of the lands as given by the sheriff, in his return to the fieri facias, is so vague and uncertain as to convey no valid title to the plaintiff as purchaser. What degree of certainty in the specification of the land taken and sold is necessary to be given by the sheriff, in his return to the fieri facias under which the levy was *589 made, is a question of importance, and deserves to be carefully-considered.
By the common law land was not liable to be taken in execution and sold for the payment of debts. Under a fieri facias nothing, according to the common law, could be taken but chattels, moveable property, the industrial fruits of the earth then growing, such as corn, wheat, &c., pr leases for years, of which the writ commanded the sheriff to levy the debt, by a sale, converting them into money. The sale of all personal property passing the right without any more solemn act than a mere delivery; a sale and delivery, by the sheriff of- such property, was held to be sufficient in all cases to vest a complete and absolute title in the purchaser, without any particular specification of the thing, thus taken and sold. It was, therefore, unnecessary for the sheriff to make any return of, a fieri facias .either for his own justification, or as an evidence of the title of the purchaser of the goods ; although the sheriff might be required to make return of such an execution, so as to compel him to shew what he had done towards levying the debt as commanded, and so as to enable the plaintiff, if necessary, to proceed further against the defendant for the recovery of the whole or the residue of his claim, (s)
By an English statute passed in the year 1285,(t) lands were partially subjected to be taken in execution under an elegit, and held until the debt should be levied upon a reasonable price or extent.(u) This statute having, however, prescribed no mode of proceeding, nor required of the sheriff any return of the execution ; it was held, that what was a reasonable price or extent could only be ascertained by a jury; which inquisition by a jury, it was also held, the sheriff was bound to take and return; because it materially affected the title to the inheritance ; and because, where an inquisition was thus required, it was fit and proper, that it should be returned- to enable the court to judge of its sufficiency and of the propriety of its being placed upon the same record with the judgment, to which it was the sequel. And hence it became the established law, that all writs of elegit, under the statute, should be returned; and that the inquisition and return should be filed as a part of the record of the case. Whence it is evident,-that a title by elegit must be thus pu.t in writing and recorded.(v)
*590 This had been introduced as the law of Maryland and was in regular and constant operation,(w) when it was declared, by a British statute passed in the year 1732,(x) that real estates, situate in the plantations, belonging to any person indebted, should be subject to the like process for selling and disposing of the same towards the satisfaction of debts as personal estate. This British statute appears to have been first introduced as the law of Maryland about the year 1740. (y) This statute, however, specified no mode of judicial proceeding, nor designated any form of execution, but, like the previous English statute, under which the proceeding by elegit had been framed, it -merely declared the rule, leaving its application to be made by the courts of justice in such manner and form as they deemed best.
In Maryland, for the purpose of executing and conforming to this British statute, the writ of fieri facias was so altered as to command, that the debt should be levied of “ the lands and tenements” as well as of the goods and chattels of the defendant. And as an English statute passed in the year 1676, (z) and which had been then adopted here, had declared, that no estate or interest in lands, exceeding the term of three years, should be assigned or granted unless by deed or note in writing; and as the acts of Assembly required all conveyances of any estate, for above seven years, in lands to be in writing and recorded ;(a) it seems to have been always considered and held, that, although the title to land, as in case of a levy of the fieri facias upon personalty, passed by the sale made by the sheriff; yet some written evidence of the sale was necessary, and that such evidence should be recorded. Hence although no inquisition was required, as under the English statute giving the elegit; yet, it seems to have been always understood, that, in all cases, where real estate was levied upon and sold, it was necessary, as an evidence of the title which had been so passed by the sale, that the fieri facias should be returned, that the sheriff should specify with sufficient certainty in his return the real estate which he had so sold, and that the return so made by him should be recorded.(b)
Upon these general principles it has been laid down, that a return of a sale of lands under a fieri facias should regularly, for *591 the security of purchasers, describe the premises with precision; but it is enough if the description be such as that the property sold may be clearly identified, or sufficiently known and ascertained. It is not necessary, that it should be specified with technical minuteness. Thus if the land.be described as, “ one tract of land called Habitation Rock containing 360 acres more or less, situate in North Hundred, Baltimore county ;”(c) or as “ all that part of the tract of land called Charles & Benjamin, which was devised to E. D. B. by his father R. B. ;”(d) or by a particular name, as “ a tract of land called Borough Hall, containing the supposed quantity of 130 acres of land more or less,”(e) it is sufficient. Because the sheriff, not having the title deeds within his reach, cannot be presumed to have it in his power to give a more particular description of the land he sells. (f) But where it was designated by names common to all similar property, as thus; “to dwelling-house, gristmill, sawmill, and fullingmill, and all other buildings belonging thereunto, with one hundred acres of land joining the said property,” the return was held to be defective for want of a specification :(g) and so too where the return described the land as “ part of Resurrection Manor, containing 251 acres more or less it was held to be void for uncertainty; because there was nothing by which it could be ascertained whether that part was to be located on the north, south, east, or west, of the whole tract. But in this latter it was admitted, that the return would have been good if it had designated a whole tract by any distinct name or description, such as a tract of land called part of a tract; and not as a tract of land being part of a tract called Resurrection Manor.(h)
According to these decisions and principles the return under consideration must be deemed sufficient when taken either altogether or in its several parts. The property sold is described as consisting of several parcels of land. First, of “ one tract of land called the Pastures enlarged.” About this there can be no doubt. Secondly, of “ one tract of land called Osbourne’s lot and part of *592 Pleasant Grove.” This is a designation of one entire tract of land of such a name; it is not, as seems to have been supposed, a sale of an uncertain part of a tract of land called “ Pleasant Grove and therefore the description of this parcel also is sufficiently certain. Thirdly, of “ one tract of land called Duvall’s Pleasure or part of Duvall’s Pleasure.” This is a designation of one whole tract having the one or the other of two names, and is, therefore, a sufficient description. Fourthly, of “ one tract of land called Teukesbury and a part of Teukesbury and Walker’s Delight.” This description also clearly refers to and designates one parcel of land as a whole and not as a part of a tract. And lastly, of " a tract of land called Friendship.” This description is confessedly sufficient.
Hence it clearly follows, that as this return is sufficiently descriptive in its several parts, it must be so considered as a whole, and when taken altogether. Consequently this plaintiff, who has been thus returned as the purchaser, has thereby obtained such a valid right to the lands held by the defendant JVathan Waters, as entitles him to have the fraudulent deeds complained of set aside so far as they at all interfere with his claim.
Whereupon it is decreed, that the said deed bearing date on the 17th day of February 1824, and also the deed bearing date on the 29th day of August 1825, and the records thereof be and the same are hereby set aside and declared and directed to be held, deemed and taken to be utterly null and void to all intents and purposes whatever, so far as the same may interfere with or in any manner affect the right and claim of the said plaintiff Charles Duvall, unto the several parcels of land specified in the said return to the said writ of fieri facias, by which it appears he became the purchaser thereof as in the proceedings mentioned.

 Although in England the cutting of timber, by a tenant in fee simple, cannot be deemed waste; yet if the public has an interest in the forest trees, or they are reserved for public use, as for ship building, or the like, it is then held to be waste to fell such trees ; and the tenant in fee simple, may be restrained from cutting them by injunction. — Jacob L. Dict. verb. Waste. — Bishop of Winchester v. Wolgar, 3 Swan. 493, note. By a clause in the colonial charter of Massachusetts; and, by several acts of parliament, all while pine trees of the diameter of twenty-four inches and upwards, of twelve inches from the ground, growing in Maine, New Hampshire, Rhode Island, Connecticut, New York, and New Jersey, were, under the colonial government, reserved to the use of the crown for masting the royal navy. This white pine, the ancient and majestic inhabitant of the North American forest, says Michaux, is still the loftiest and most valuable of thejr productions, and its summit is seen at an immense, distance aspiring towards heaven, in some instances to the height of one hundred and eighty feet from the ground, and far above the heads of the surrounding trees. The felling of any of these white pines was prohibited by a *572 heavy penalty, made recoverable in the colonial courts of Vice Admiralty, without a trial by jury. The claims of right to these trees, and the execution of the laws for their preservation, produced much irritation among the colonists ; insomuch so, that the controversies respecting them, in those colonies to which the statutory prohibition of felling them extended, may be considered as some among the minor causes of the revolution. — 9 Anne, c. 17; 8 Geo. 1, c. 12; 2 Geo. 2. c. 35; 1 Chal. Opin. Em. Law, 111, 116, 119, 137; 2 Hutch. His. Mass. 228; 2 Belk. N. Hamp. 28, 89, 128; Michaux’s Sylva, art. White Pine. — Since the revolution Congress have deemed it expedient to make similar reservations of the Live Oak, and Red Cedar, growing on the public lands, for the use of the navy. — 1st March, 1817, ch. 22; 2d March, 1831, ch. 65.

 Co. Litt. 53; 2 Inst. 299, 389; 52 Hen. 3, c. 23; 13 Edw. 1, c. 14; Kilt. Rep. 209, 212; Jefferson v. Bishop of Durham, 1 Bos. & Pul. 108, 121; Goodeson v. Gallatin, Dick. 455.

 Co. Litt. 53; 2 Inst. 300.

 Co. Litt. 53; Clifton’s Case, 5 Co. 76.

 2 Inst. 302, 305, 403; 3 Blac. Com. 227.

 Jacob. L. Dic. verb. Estrepement.

 2 Inst. 328.

 F. N. B. 139; 2 Inst 328; 3 Blac. Com. 225; Jacob. L. Dic. verb. Estrepement.

 Eden. Inj. 136; Mitchell v. Dors, 6 Ves. 147; Crockford v. Alexander, 15 Ves. 138; Mogg v. Mogg, Dick. 670.

 2 Harr. Ent. 149, 800; Adams v. Brereton, 3 H. & J. 124; 1763, ch. 18, s. 89 & 94; 1779, ch. 25, s. 2.

 3 Blac. Com. 227; Greene v. Cole, 2 Saund. 252, note 7; White v. Wagner, 4 H.& J. 373; McLaughlin v. Long, 5 H. & J. 113.

 The Mayor & Com. Norwich v. Johnson, 3 Mod. 90; S. C. 2 Show. 457.

 Gibson v. Smith, 2 Atk. 183; Hannay v. McEntire, 11 Ves. 54; Coffin v. Coffin, Jacob. 70.

 The Universities of Ox. & Cam. v. Richardson, 6 Ves. 706; The Keepers, &c. of Harrow School v. Alderton, 2 Bos. & Pul. 86.

 Robinson v. Litton, 3 Atk. 211.

 Garth v. Cotton, 3 Atk. 754.

 Bewick v. Whitfield, 3 P. Will. 268, note; Hayward v. Stillingfleet, 1 Atk. 422.

 Bewick v. Whitfield, 3 P. Will. 268, note; Farrant v. Lovel, 3 Atk. 723.

 Abraham v. Bubb, 2 Freem. 53.

 Lord Bernard’s Case, Prec. Chan. 454.

 Farrant v. Lovel, 3 Atk. 723; Humphreys v. Harrison, 1 Jac. & Walk. 561.

 Smallman v. Onions, 3 Bro. C. C. 621; Hole v. Thomas, 7 Ves. 589; Twort v. Twort, 16 Ves. 128.

 Clarke v. Clarke, MS., 24th January 1822.

 Jesus College v. Bloom, 3 Atk. 262; Eden. Inj. 146.

 Pillsworth v. Hopton, 6 Ves. 51; Mitchell v. Dors, 3 Ves. 147; Hanson v. Gardiner, 7 Ves. 305; Smith v. Collyer, 8 Ves. 89; Courthope v. Mapplesden, 10 Ves. 290; Crockford v. Alexander, 15 Ves. 138; Norway v. Rowe, 19 Ves. 147; Jones v. Jones, 3 Meriv. 173.

 Pillsworth v. Hopton, 6 Ves. 51; Smith v. Collyer, 8 Ves. 89; Norway v. Rowe, 19 Ves. 147.

 Mitf. Plea. 136.

 Lathropp v. Marsh, 5 Ves. 259; Pulteney v. Shelton, 5 Ves. 260, note; Onslow v.-, 16 Ves. 173.

 3 Blac. Com. 227; Calvert v. Gason, 2 Scho. & Lefr. 561.

 The Universities of Ox. & Cam. v. Richardson, 6 Ves. 689.

 Hogg v. Kirby, 8 Ves. 215; Wilkins v. Aikin, 17 Ves. 422; Rundell v. Murray, Jac. Rep. 311; Act of Congress, 15th February 1819, ch. 19.

 Atkinson v. Henshaw, 2 Ves. & Bea. 85.

 Powell Mort. 294, note.

 Gordon v. Rothley, 3 Ves. 572; Freeman v. Fairlie, 3 Meriv. 29.

 Fells v. Read, 3 Ves. 71; Lady Arundell v. Phipps, 10 Ves. 148.

 Fells v. Read, 3 Ves. 70; Smith v. Collyer, 8 Ves. 89; Berkely v. Brymer, 9 Ves. 356; Lady Arundell v. Phipps, 10 Ves. 148; Courthope v. Mapplesden, 10 Ves. 291; Lowther v. Lord Lowther, 13 Ves. 95; Crockford v. Alexander, 15 Ves. 138; Earl Cowper v. Baker, 17 Ves. 128; Astley v. Weldon, 2 Bos. &. Pul. 351; Kimpton v. Eve, 2 Ves. & Bea. 349.

 Harris v. Thomas, 1 Hen. & Mun. 18; Shubrick v. Guerard, 2 Desau. 616,

 The Attorney General v. Norwood. — This was an information filed in the High Court of Chancery, on the 13th of April 1775, at the relation of Josias Bowen to vacate a patent which had been obtained by -the father of the defendants, for a tract of land, which the relator had previously caused to be surveyed; but was prevented from obtaining a patent for it, by the father of the defendants having fraudulently contrived previously to get a patent for the same land.
The information states, that in confidence of his being clearly entitled to a patent, the relator had brought his action of ejectment against the father of the defendants; pending which action his certificate was caveated, and the caveat ruled good, by reason of Norwood’s producing an elder patent; which patent it is averred he had fraudulently obtained; that afterwards the relator’s action of ejectment was non pros’d with costs; which judgment he superseded; that Norwood, after that, conveyed the land to his son, this defendant Nicholas Norwood; and, by his will, appointed his other son, the defendant Edward Norwood, his executor, and died; that Nicholas Norwood had taken possession of the land, and was committing great waste; and that Edward Norwood had, by scire facias, revived the judgment for costs in the action of ejectment, and threatened to sue out execution against the relator.
Upon which the information prayed, that the patent obtained by Norwood might be vacated, and possession of the land delivered; that Nicholas Norwood might, by an injunction, be restrained from, committing waste, &c.; and that Edward Norwood might be prohibited from proceeding at law.
The relator made affidavit to the truth of the facts set forth in the information; and also gave bond to prosecute as in common cases to stay proceedings at law. Upon which, on the same day, an injunction was granted as prayed.
On the 7th of July 1785, it was decreed, that the injunction be made perpetual, that the patent be vacated, and thatthe possession be delivered. — Chanc. Proc. No. 2, fol. 211. — This case is in other respects more fully reported in 2 H. & McH. 201.
Coale v. Garretson. — This bill was-filed, on the 15th of February 1791, by Richard Coale against Job Garretson. It sets forth all the particulars of the plaintiff’s case, by which it appears in substance, that on a certificate, bearing date on the 8th of January 1773, he had in April 1775 obtained a patent for a tract of land called *582 Coale’s Discovery. But that the defendant had, by the fraudulent means therein stated, caused a certificate of survey of the same land to be made on the 17th of June 1772; upon which he had obtained a patent; that afterwards this defendant brought an action of ejectment and obtained a judgment. The bill alleged, that this defendant had been put into possession by the sheriff under a writ of possession ; and that he had issued a ca. sa. for costs, which this plaintiff had superseded; but it is not averred, or even intimated in the bill, that this defendant had committed, or ever threatened to commit waste. Yet the bill prayed for an injunction to prevent the said Job Garretson from committing any waste on the said tract of land called Coale’s Discovery ; also to prevent the said Garretson from serving the said execution, or from proceeding any further on the said judgment; and for general relief, &c. There was an affidavit, in the usual form, of the truth of the matters set forth; and an injunction bond.
15th February, 1791.-Hanson, Chancellor. — Issue subpoena and injunction to stay execution for costs ; but not waste.
The defendant on the 14th of December 1793, put in his answer by which he denied all fraud, and also positively denied the legality and validity of the plaintiff’s title, &c.
Some time after which the plaintiff, by his petition on oath, set forth and averred, that the defendant had cut down and carried away wood and timber growing on the land in controversy; and still continued to commit waste and destruction upon the land, &c. Whereupon he prayed for an injunction to stay waste and destruction upon the said tract of land called Coale’s Discovery, &c.
28th October, 1795. — Hanson, Chancellor. — Issue injunction to prohibit waste, &c. In Coale’s Discoveiy, in Baltimore county, surveyed for Richard Coale agreeably to the prayer of this petition.
After which the case coming on for final hearing on bill, answer and proofs, it was on the 25th of May 1797 decreed, that the injunction be made perpetual, and that the defendant convey the land to the plaintiff. MS. — In other respects this case seems to be sufficiently reported in 1 H. & J. 370, 378.

 Maryland, to witThe State of Maryland to Michael Krips, his agents, hirelings and servants, Greeting: Whereas Edward Elannagan of Baltimore county, and Elizabeth his wife have exhibited unto us in our High Court of Chancery their bill of complaint for relief in equity, and to stay the commission of waste in and upon part of a tract of land called Mountenay’s Neck lying and being in Baltimore county, pending a certain action of ejectment brought by them the said Edward Flannagan and Elizabeth his wife, against you the said Michael Krips, as tenant in possession of said land, or some part thereof, in the General Court of the Western Shore : We therefore command, and strictly injoin you the said Michael Krips, your agents, hirelings and servants, and every of them to stay, surcease and forbear digging, carrying away and removing the dirt, earth and soil of the said land and premises; or doing or committing any manner of waste, spoil, and destruction thereon, pending the said suit, or until the further order of the High Court of Chancery. Hereof fail not, as you will answer the contrary at your peril.
Witness the Honourable John Rogers, Esquire, Chancellor, this 28th day of April, Anno Domini, 1733. Wm. Hyde, Reg. Cur. Can.
See Old Book of Forms, page 13.

 Gittings v. Dew. — The bill states, that the plaintiff James Gittings was seized and possessed of several parcels of land in Baltimore county, into a part of which the defendant Robert Dew had wrongfully entered; that the plaintiff had commenced an action of ejectment against the defendant to recover such parts as he had entered upon, which suit was then undetermined; that the defendant was cutting down the timber and other trees thereon and making great waste and destruction., and the plaintiff apprehended would continue to do so. Upon which the bill prayed for a subpoena and an injunction, prohibiting the defendant, his agents, &c. from cutting down or carrying away timber trees or other trees or wood growing and being on the land; and from committing any waste thereon until the final decision and judgment in the ejectment ; or until further order, &c.
14th January, 1803. — Hanson, Chancellor. — Issue subpoena and injunction agreeably to the prayer of this bill.
It does not appear that the defendant ever put in any answer to this bill. But on the petition of the plaintiff, stating that the defendant had committed waste in breach of the injunction, accompanied by an affidavit of Archibald Davis stating the circumstances, an attachment was ordered on the 1st of January 1807 returnable to February term. The attachment having been issued and served, the defendant Dew appeared and filed his answer on oath, to the petition, in which he states, that he had cut some cordwood as alleged; but that the plaintiff had not, as he ought to have done, caused the surveyor to lay down his claim and pretensions; that this defendant had been assured by his counsel, that after the first term to which the injunction was returnable he had a right to cut wood ; that under such an impression, and firmly believing as he then did, that the plaintiff had no right to the land, he had cut the cordwood as stated ; but in doing so, he had no intention of setting the authority of this court at defiance ; and was ignorant that what he had done was wrong.
26th Febniary, 1807. — Kiity, Chancellor. — The suit at law was to decide title and location, and the injunction to restrain waste until those points were decided. Therefore it is no sufficient answer for the defendant to say that the land was his and the location unascertained. If the plaintiff, at law, is tardy, the defendant must urge him to proceed. In consideration of the excuses contained in the answer, and the plaintiff not pressing-for a commitment or fine; it is ordered, that the defendant Robert Dew be discharged from.the attachment on paying the costs thereof.

 Mitf. Plea. 144.

 Williamson v. Carnan, 1 G. & J. 184.
Pascault v. The Commissioners of Baltimore. — 1st March, 1797. — Hanson, Chancellor. — The motion to dissolve the injunction in this cause issued, being submitted, the bill and .answers were by the Chancellor read and considered.
When the bill was presented to him for the purpose o'f obtaining the injunction, it was not his idea, that this court ought to control the judgment of the commissioners. It appeared to him, that whenever they exercise their judgment on a subject, over which the law hath invested them with power, and they determine on an act to which that power is competent, they cannot with propriety be restrained. It was not his province to decide, whether or not a street should be paved, or a sewer repaired, or whether or not the intended act of the commissioners would be beneficial to a majority of the persons to be affected by the act. But he considered the power of this court rightfully exercised, on the application of any person, who is apprehensive of injury, in restraining a proceeding not authorized by law. He conceived, that the power conferred on them by the act of Assembly referred to in the bill does not extend to the removing a pavement already made, which was not even alleged to want repairs, and lowering a street for the avowed purpose of changing the course of waters, against the consent and remonstrance of any individual citizen, whose property is to be thereby affected. The power conferred on them by the aforesaid act of Assembly, is to make, amend, repair, pave, and keep clean streets, alleys and lanes ; to make, amend and repair bridges ; and amend, and repair sewers ; and so long as they bona fide exercise only that power, they will not be restrained by this tribunal.
Now supposing the extent of their power to be only doubtful, and that the complainants on bringing suit at law, and shewing, that they have been injured by the commissioners’ completing their intended act, might recover ample damages; it is certainly better, that an unlawful proceeding be prevented, than that recourse be had to a court of law, after the injury is done.
The Chancellor’s opinion has not been changed by a perusal of the answers. He regrets, that the point was not argued by the counsel.
It is ordered, that the aforesaid injunction be continued until the final hearing of the cause, or the further order of this court.

 Eden. Inj. 209; Anonymous, 1 Ves. jun. 93; Calvert v. Gason, 2 Scho. & Lefr. 561; Coale v. Garretson, ante 581, note.

 13 Eliz. c. 5.

 Com. Dig. tit. Execution, (C. 7.)

 West. 2, c. 18.

 2 Inst. 394.

 2 Inst. 396; Dyer. ca. 71, fol. 100; Fulwood’s Case, 4 Co. 67; Palmer’s Case, 4. Co. 74; Hoe’s Case, 5 Co. 90; Underhill v. Devereux, 2 Saund. 69, note 2.

 Kilty’s Rep. 144.

 5 Geo. 2, c. 7.

 Davidson’s Lessee v. Beatty, 3 H. & McH. 612.

 29 Car. 2, c. 3, s. 3.

 1715, ch. 47.

 Bull v. Sheredine, 1 H. & J. 410; Boring v. Lemmon, 5 H. &. J. 223; Barney v. Patterson, 6 H. & J. 204.

 Boring v. Lemmon, 5 H. & J. 223.

 Berry v. Griffith, 2 H. & G. 337.

 Thomas’s Lessee v. Turvey, 1 H. & G. 435.

 Barney v. Patterson, 6 H. & J. 204; Scott v. Bruce, 2 H. & G. 262; Berry v. Griffith, 2 H. & G. 337; Underhill v. Devereux, 2 Saund. 68 f.

 Williamson v. Perkins, 1 H. & J. 449; McElderry v. Smith, 2 H. & J. 72; Fitzhugh v. Hellen, 3 H. & J. 206.

 Fenwick v. Floyd, 1 H. & G. 172; Purl’s Lessee v. Duvall, 5 H. & J. 69; Waters v. Duvall, 6 G. & J. 76.